MARTHA L. JUNKIN, Executrix, Appellee, v. FRED W. McCLAIN et al., Defendants, GEORGE C. WOODS et al., Appellants.

No. 43349.

F<small>EBRUARY</small> 18, 1936.

R<small>EHEARING</small> D<small>ENIED</small> J<small>ULY</small> 31, 1936.

Simmons & Simmons and Thoma & Thoma, for appellants.

Ralph H. Munro, for appellee.

M<small>ITCHELL</small>, J.—On November 12, 1925, Martha L. Junkin, executrix of the estate of Frank W. Junkin, deceased, entered into a written contract with Fred W. McClain, under the terms of which she sold a certain business building located in the city of Fairfield, Iowa. The contract provided that McClain was to deed to the seller certain land located in Canada, and in

addition he was to pay the sum of $30,000, $500 per year on December 1st of each year, beginning with 1926, for five years, and $1,000 a year on December 1st of each year thereafter until said principal sum was reduced to $15,000, when the balance became due. It further provided that McClain was to pay interest and all taxes levied against the property before they became delinquent, and that he was to carry insurance, payable to the seller in case of loss, in an amount of not less than $11,000; and that "all of which payments and charges therefor shall be a first lien upon the rents accruing upon said premises conveyed by said executor, a deed for which shall be executed at once by said executrix to said McClain and placed in escrow in the Farmers State Bank of Fairfield, Iowa, to be delivered to said McClain upon the full payment of the above consideration." Possession was to be given on December 1, 1925.

Pursuant to the terms of the contract, McClain conveyed the Canada land to the seller and the executrix delivered possession of the business block to him. McClain made payments thereon in accordance with the provisions of the contract up until the time that the taxes became due for the year 1930. He failed to pay the taxes for 1930 and 1931, and both were delinquent before this action was commenced, and in addition he was in arrears in the payment of the installment due September 1, 1932.

On the 19th day of April, 1930, McClain, desiring to make certain repairs upon the building in question, borrowed from George C. Woods the sum of $3,000, and executed to the said Woods what is termed a "collateral" note, signed by McClain and his wife. This instrument provided that there was deposited with the said Woods, as collateral security for the amount owing him by McClain, certain leases, one known as the "Gibbons" lease, one known as the "Great Atlantic & Pacific Tea Company" lease. McClain also assigned as collateral the contract for the purchase of the said property from the estate. The Gibbons lease was dated October 14, 1929, and was for five years. The Atlantic & Pacific lease was for one year, with provision for renewal at the end of each year for a period of eight years provided the lessee desired to renew. The rental was on the basis of $160 per month on the Atlantic & Pacific lease and $125 per month on the Gibbons lease. The leases were delivered to Woods.

On December 2, 1931, McClain desired to borrow additional

money to finish improvements on the store building and borrowed $1,000 from George C. Woods, assigning as additional security what was known as the "Archibald" lease, also a lease covering part of the property McClain had purchased under the contract.

The collateral agreement also provided that McClain was to assign all leases that he thereafter made on the said described property, to Woods, until the amount due Woods was paid. On December 12, 1931, McClain entered into a lease for another year with the Atlantic & Pacific Company covering the same property, the former lease having about terminated, and transferred the lease to Woods, to be held as collateral to his note.

On September 17, 1932, McClain sold and conveyed by quit-claim deed, to Gladys L. McClain, for a good and valuable consideration, the premises in question, "subject to the present encumbrances against the property, which the grantee does not assume." On March 19, 1933, Gladys L. McClain executed a new lease with the Atlantic & Pacific Company for one year from and after April 30, 1933. This lease, pursuant to the provisions of the collateral note of McClain to Woods, was assigned to Woods and delivered to him. On March 16, 1934, Gladys L. McClain, pursuant to the option right of the Atlantic & Pacific Company, executed with said concern another written lease for one year.

Woods appointed, as his agent to collect the rents, McClain, and from the collection of these rents the $1,000 note was paid in full, together with interest, and there was the sum of $310.37 applied upon the $3,000 note. However, there was a balance due Woods on said note of $3,796.70, with interest from September 29, 1934.

It appears in the record that Woods did not receive all of the rents which were assigned to him; that he at different times permitted McClain to retain part of the rentals which McClain said it was necessary to do in order to make repairs upon the building. Woods also at one time executed a written waiver on the rents from the Atlantic & Pacific lease for a period of months, in favor of Susannah Hisel, to whom McClain owed certain indebtedness.

This action was commenced on the 24th day of October, 1932, in equity, to foreclose the written contract for the sale of the real estate, to enforce the provisions thereof, asking that

the payment of taxes and other provisions of the contract be declared a first lien on the accruing rents. There were joined as defendants in the action, in addition to the McClains, George C. Woods, and the Atlantic & Pacific Tea Company, Archibald and the other tenants in the building. The petition alleged that McClain was insolvent and that the property was of less value than the unpaid portion of the purchase price, and asked for the appointment of a receiver to take charge of the said property and to collect the rents during the period of foreclosure. On the 14th day of September, 1934, an amendment was filed by the plaintiff, joining Gladys L. McClain as one of the defendants, and notice was given to her as by law provided. In her separate answer Gladys L. McClain claimed that she was entitled to the rentals, subject to the assignment to Woods, up until the time of the commencement of the action against her, to wit, September 14, 1934.

The court found the equities to be with the plaintiff, and that by agreement of the parties one Harry McWhirter had collected part of the rents, and other rents accruing since the commencement of the action had been paid to the clerk of the district court. The lower court found that under and by virtue of the provisions of the contract sued upon, payments of principal, interest, insurance, taxes, and charges therefor, were a first lien upon the rents accruing upon said premises, which said lien the plaintiff was entitled to have specifically enforced as to all rents accruing upon said premises from and after October 24, 1932, the date of the filing of the petition and also the date of the service of the notice on all defendants except Gladys L. McClain, who held only a quit-claim deed to the premises in question, made by Fred W. McClain and wife. The court ordered and adjudged that the rent funds in the hands of McWhirter and in the hands of the clerk of the district court be paid to the plaintiff for application upon the indebtedness of Fred W. McClain, as provided by the contract in question; and that the plaintiff have a decree of specific performance against McClain, and that unless the amount due under the contract was paid within thirty days, together with interest and all unpaid taxes, special execution issue for the sale of the interest of said McClain in said premises; and that the rights of the defendants and each of them, except the right of redemption, be and the same stand foreclosed and barred forever.

From this decree Gladys L. McClain and George C. Woods have appealed.

I. The first question that confronts us in this case is the construction of the real estate contract which was entered into between these parties. It must be kept in mind that no question is raised as to the right of executrix to enter into this contract.

■■■ This real estate contract is what is called in the reports and text-books generally "Contract of Sale and Purchase," or a "Bond for Deed," because it is a contract for sale of real estate with the legal title of record retained by the seller, pending payment of the purchase price, and upon completion of payment of such purchase price the instrument transferring the legal title to be delivered to purchaser.

The statutes of Iowa provide for and recognize the vendor and the purchaser in contracts for sale of real estate or in bonds for deeds, where a conveyance is to be made upon the payment of purchase money, are in the respective positions of mortgagee and mortgagor in any action brought for enforcement or foreclosure under such contract.

Code, section 12382, is as follows: "12382. Foreclosure of title bond. In cases where the vendor of real estate has given a bond or other writing to convey the same on payment of the purchase money, and such money or any part thereof remains unpaid after the day fixed for payment, whether time is or is not of the essence of the contract, the vendor may file his petition asking the court to require the purchaser to perform his contract, or to foreclose and sell his interest in the property."

Code, section 12383, is as follows: "12383. Vendee deemed mortgagor. The vendee shall in such cases, for the purpose of the foreclosure, be treated as a mortgagor of the property purchased, and his rights may be foreclosed in a similar manner."

By the very literal terms of the provisions of the last-quoted section, the vendee in such cases is treated as a mortgagor of the property purchased, and the vendor as a mortgagee with right to foreclose in manner similar to that of the ordinary mortgage.

In a very recent case, Wood v. Schwartz, 212 Iowa 462, at page 470, 236 N. W. 491, 494, this court said:

"It is well settled by our previous cases that, under a contract such as the one between Schwartz [vendor] and Middaugh

[purchaser], Middaugh held the equitable title, and Schwartz retained the legal title, to the real estate as security for the payment of the purchase price. Middaugh held an equitable title in real estate which would descend to his heirs, but Schwartz, at the time of his death, had only personal property, which would pass to his personal representatives. * * * In In re Estate of Miller, 142 Iowa 563, at page 566, 119 N. W. 977, 978, we said:

" 'It has been held repeatedly by this court that when a landowner enters into a contract of sale whereby the purchaser agrees to buy, and the owner to sell, and whereby the vendor retains the legal title until the purchase money or some part thereof be paid, the ownership of the real estate, as such, passes to the purchaser, and that from such time forth the vendor holds the legal title as security for a debt and as trustee for the purchaser. The interest acquired by the vendee is "land," and the right and interest conferred by the contract upon the vendor is "personal property." In case of the death of the vendee, his interest in the land would descend to his heirs. In case of the death of the vendor, his interest would pass as personal estate to his administrator. A judgment against the vendee would become a lien on the land, inferior, of course, to the rights of the vendor. A judgment against the vendor would not become a lien upon the land, nor could an execution thereunder be made by levy and sale of the land.' "

Thus there can be no doubt that in the case at bar, from and after the date of the real estate contract, to wit, November 12, 1925, the purchaser, McClain, held equitable title to the premises, and the vendor, Martha Junkin, executrix, retained the legal title to the real estate as security for the payment of the remainder of the purchase price. The purchaser's equitable estate in the premises was such that in the event of his death it would descend to his heirs, while the vendor held only personal property, which, in the event of her death, would pass to her successor administrator. The ownership of the real estate, as such, was in the purchaser and not in the vendor. The vendor held the legal title simply as security for the remaining debt, the balance of the purchase price, and as trustee for the purchaser or his assigns or successors. The interest or right acquired by the vendee or purchaser was "land," and the interest

or right retained or conferred by the contract upon the vendor was "personal property." In such cases the security held by the vendor must be understood to be such as is given by the statute to the vendor of real estate when part or all of the purchase money remains unpaid. And under such statute the vendee is treated as the "mortgagor" of the property and his rights may be foreclosed in the same manner. The parties are to be treated for all purposes of this suit as "mortgagee" and "mortgagor," respectively. In this action to foreclose the contract the vendee is always treated as the mortgagor of the property purchased, and his rights and interests foreclosed in a similar manner. It is the intention and design of the statute to place the vendor and vendee of real estate in the same position, so far as related to the remedy, as the mortgagor and mortgagee in express mortgages.

Thus we find that in the case at bar these parties are in the same position as if the executrix had deeded the land to McClain and he had given back a mortgage to secure the unpaid balance.

■■■ The instrument in question, wherein the purchaser is the mortgagor and the vendor the mortgagee, as the usual mortgage does, provides for a lien upon the rents until all the payments and charges are met. How is this provision to be construed, and what is the remedy for enforcement?

It is the contention of the appellant, and we believe correctly, that the remedy for the enforcement of such a provision is exactly the same, whether the instrument in which it is found is an express legal mortgage or an equitable mortgage.

II. Receiverships in mortgage or lien foreclosures were not formerly much invoked, but in the last few years—due no doubt to the economic condition that confronted the country—this court has frequently had the question before it.

In the case of First National Bank v. Security Trust & Savings Bank, 191 Iowa 842, 844, 181 N. W. 402, 403, the mortgage granted, bargained, sold, and conveyed the premises by description, together with the rents, income, and profits thereof, to secure the debt, and this court said: "It is the law in this state, in harmony with the general holding, that the right of the holder of a mortgage upon real estate, pledging the rents and income as security to the defendant [mortgagee] for the same, does not arise until action has been commenced to enforce collection of the debt."

Again, in Cooper v. Marsh, 201 Iowa 1262, at page 1266, 207 N. W. 403, 405, we said:

"Even if the mortgage provided in general terms for a pledging of the rents and profits of the mortgaged premises, it is the uniform holding that the mortgagee acquires no lien by virtue of his mortgage upon said rents and profits until foreclosure proceedings are commenced and the appointment of a receiver is sought. * * * The general rule is that, although the rents and profits are pledged in a mortgage, the mortgagor has the right to dispose of the same without being liable to account to the mortgagee therefor prior to the institution of an action wherein foreclosure and the appointment of a receiver are asked."

In John Hancock Mutual Life Insurance Company v. Linnan, 205 Iowa 176, 178, 218 N. W. 46, 47, the mortgage recited:

"And the party of the first part hereby pledges the rents, issues, and profits of said real property for the payment of said principal sum, interest, attorneys' fees, and costs," etc. Mortgagee contended the instrument created a specific lien upon the rents, issues, and profits of the mortgaged premises; that the mortgage assigned the rents, issues, and profits to mortgagee as security for the loan. The opinion says at page 180:

"This court has repeatedly held that a mortgagee has no lien upon the rents, issues, and profits under a clause merely pledging the same as security for the debt without making the same a present lien thereon, until an action to foreclose the mortgage is commenced and the appointment of a receiver requested. * * *

"The right of the mortgagor to freely sell and dispose of crops grown upon the mortgaged premises or to assign the rent therefor at any time prior to the commencement of an action to foreclose the mortgage and for the appointment of a receiver has been repeatedly sustained by this court."

And at pages 181, 182:

"Manifestly, the mortgagee could have no purpose in asserting a lien upon rents, issues, and profits so long as there was no default in the terms of the mortgage. The intention of the mortgagee to claim a lien thereon only in case the mortgagor de-

faulted in the performance of certain designated terms of the contract is not only manifest, but clearly implied thereby. This being true, no present lien upon the rents, issues, and profits was created by the mortgage. * * *

"We think it entirely proper to say that the parties intended the land to constitute the primary security for the mortgage debt. The provision giving a lien upon the rents, issues, and profits was secondary and intended to meet a possible future contingency. The several clauses of the mortgage must, of course, be construed together. The distinction between primary and secondary security in the sense we have used the term is of significance both as to the nature and character of the lien intended and also the remedy to be pursued in giving effect thereto."

In the recent case of Andrew v. Home Savings Bank, 215 Iowa 401, 405, 246 N. W. 48, 49, this court said:

"At the time the lease was made, the mortgagee in the real estate mortgage had no lien on or an existing, as distinguished from a prospective, right to the rents, issues, and profits from the real estate. As has been said before many times, the clause in the real estate mortgage under consideration pledging the rents, issues, and profits does not create a lien thereon prior to the foreclosure proceedings, wherein a receiver is asked to collect such rents and profits. * * *

"She, as such mortgagee at the time when the superintendent of banking made the lease, had no title to or lien upon the rents, issues, and profits named in the real estate mortgage. * * * Such right of the mortgagee to the rents, issues, and profits did not arise until the commencement of the foreclosure proceedings wherein a receiver under the real estate mortgage was asked."

And at page 406:

"When the superintendent of banking made the lease in question and collected the rent in advance, he was exercising his legal right to thus rent the real estate. * * * At the time when the superintendent of banking entered into the lease, the aforesaid prospective right of the real estate mortgagee to the rents, issues, and profits had not been made a present lien, right, or interest through the foreclosure of the mortgage, and an appli-

cation for a receiver thereunder. Hence, the superintendent of banking at the time the lease was executed had an absolute right, under the circumstances, to dispose of the rents, issues, and profits as he saw fit. When so acting, the superintendent of banking may have been prompted by one motive or another. The motive which prompted the banking superintendent to exercise his legal right is quite immaterial under the circumstances. He had the right to make the lease."

Thus we find it is the well-settled rule in this state that the mortgagee does not have a lien on the rents and profits pledged under the mortgage until the foreclosure action was commenced.

In the case at bar, as we have pointed out, the contract for the sale of this real estate is governed by the same rules of law as if it was a mortgage. And the appellee, the seller, had no lien upon the rents pledged under the contract of sale until she commenced this action. Prior to the commencement of this action, McClain, the purchaser, had a right to sell, assign, or transfer, as long as it was a bona fide sale or transfer, the leases covering the property in question. McClain made the lease with the Atlantic & Pacific Tea Company prior to the commencement of this lawsuit. That lease was transferred to Woods as security for the indebtedness that McClain owed to Woods. The indebtedness is not in controversy. That McClain did borrow the money from Woods to repair the building is not disputed; that it was a good-faith transaction is conceded. Before the commencement of this action by the appellee, the lease to the Atlantic & Pacific Company was assigned by McClain to Woods. That lease expired the 1st day of May, 1931. On December 12, 1931, McClain entered into another lease with the Atlantic & Pacific Company for a period of one year, which would make the lease expire on May 1, 1932. This lease was assigned and transferred to Woods. Before the expiration of that lease McClain entered into another lease with the Atlantic & Pacific Company, which was to run from May 1, 1932, to May 1, 1933, and this lease was assigned to Woods and transferred to him. This assignment and transfer was made prior to the commencement of this action. In addition to this, McClain had rented a certain part of the property to one Archibald, under a written lease, and this lease was also assigned to Woods. There was also assigned to Woods a certain lease known as the Gibbons

lease. At the time this action was commenced in October of 1932, Woods was in possession of the Atlantic & Pacific lease which had been assigned to him and which lease ran to May 1, 1933. And he was also in possession of the Archibald lease, which had been assigned to him and which had under its terms some time to run. The Gibbons lease had been canceled some time before. It is the contention of the appellee that these leases were assigned to Woods as a chattel mortgage, not as a sale or transfer. She argues that due to the fact that Woods permitted certain of the rentals, to which he was entitled, to be used by McClain, and part of them to be turned over to another creditor of McClain under a written agreement, in reality all that Woods had was a chattel mortgage rather than the real ownership of the leases. With this we cannot agree. The leases were assigned to Woods under a written agreement; they were assigned as security to pay an indebtedness which McClain owed to Woods. No question is raised as to the validity of these assignments; that they were good-faith transactions is conceded. Woods therefore was the owner of the lease known as the Atlantic & Pacific lease and of the Archibald lease. Those assignments were made long before this action was commenced, and Woods was entitled to receive the money under the lease known as the Atlantic & Pacific lease up until the expiration of the lease, which was May 1, 1933, and he was entitled to receive the money collected under the Archibald lease which was assigned to him, until the end of that lease or until the end of the period of redemption, whichever was first. The lower court erred in holding that Woods was not entitled to any of the rentals under the Atlantic & Pacific lease and the Archibald lease, after the commencement of this action, to wit, October 24, 1932, and the judgment and decree will be modified to the extent herein pointed out.

█▐█ III. It is the claim of the appellant Gladys L. McClain that she is entitled, subject to the rights of George C. Woods, to rent from certain portions of the premises involved, until the 11th day of September, 1934, when she was made a party to this action and notice of said action was served upon her.

The record shows that when the original action was commenced in October of 1932, Gladys L. McClain was not made a party to the action. Some time prior to the commencement of the original action Fred W. McClain and his wife, for a valuable

consideration, made, executed, and delivered a quitclaim deed covering the property described in the original contract, to Gladys L. McClain. The quitclaim deed provided that grantee did not assume the indebtedness still owing.

In the case of Steele & Son v. Sioux Valley Bank, 79 Iowa 339, at page 347, 44 N. W. 564, 567, 7 L. R. A. 524, 18 Am. St. Rep. 370, this court said: "It is apparent that no more is contemplated by such a conveyance than to convey the interest of the grantor, whatever it may be. It should be noticed that in this form of deed the grantor does not covenant or say that he has the title, or any interest. In this respect it is in marked contrast with the ordinary deed of conveyance, which expresses exactly what the title owner can and should express, and what the purchaser desires. It in no sense purports to convey a title, not even by inference. If it was there by legal inference, then the grantor would be liable for its failure; and such is not the effect of a quitclaim deed. It is practically said in Gest v. Packwood, supra [(C. C.) 34 F. 368], that the deed is itself a notice of a want of or a defect in the title. These deeds are generally taken upon a venture. The idea is: 'I may get something, or I may not.' This court, in the cases cited, has many times said that the holder of the quitclaim deed takes it with notice of prior equities."

And in the case of Duntz v. Ames Cemetery Association, 192 Iowa 1341, at page 1345, 186 N. W. 443, 445, this court said:

"The defendant city is not in a position to claim that, in the absence of an express undertaking, the assignee of a written contract is not held to have assumed the obligations of the assignor. True the Duntz contract was not formally assigned to the city, but it did accept a quitclaim deed to the land covered by the contract. The grantee under a quitclaim is conclusively presumed to have knowledge of all prior equities, and takes subject thereto. Steele & Son v. Sioux Valley Bank, 79 Iowa 339, 44 N. W. 564, 7 L. R. A. 524, 18 Am. St. Rep. 370."

And in the case of Howell v. Howell, 211 Iowa 70, at page 75, 232 N. W. 816, 818, this court said:

"The deed in the instant case was a quitclaim, and it therefore contained no covenants. The grantee is not entitled to be considered a bona fide purchaser, and does not acquire priority

over equities or unrecorded conveyances which are valid against his grantor.''

The appellant Gladys L. McClain in this case took a quitclaim deed. Under the cases cited she took ''with notice of prior equities.'' At the time that she accepted the deed, which was shortly before the foreclosure action was commenced, her grantor was in default in the payment of installments due and had failed to live up to the terms of the contract in that he had failed to make the payment of taxes as they became due. In fact, there were at that time two years' taxes unpaid, upon which penalties were accruing. And he had failed to keep the fire insurance in force, as provided. In addition to this, at the time that this action was originally commenced, there were joined as defendants the tenants in the building, and notice was served upon them. Thus, with the knowledge of these facts that she had, Gladys L. McClain is not now in a position to say that she is entitled to the rents up until September of 1934, when this action was commenced as against her. These rentals, it was shown, were necessary to pay back taxes, and a court of equity would not permit the turning over of these rentals to a person who held a quitclaim deed and who had knowledge of the default under the terms of the contract.

It was conceded in the case at bar that McClain was insolvent, and that the value of the property was not sufficient to pay the amount due upon the contract. The court was right in the appointment of a receiver to take charge of said property.

Other questions are raised, all of which have been given careful consideration. The decree of the lower court will be modified, in that George C. Woods is entitled to the rentals received from what is known as the Atlantic & Pacific lease up until May 1, 1933, and from the Archibald lease in the amount provided in the said lease to the end of said lease or to the end of the period of redemption, whichever is first.

The costs of this appeal will be evenly divided between the appellants and appellee.

With this modification, judgment and decree of the lower court is hereby affirmed.—Modified and affirmed.

DONEGAN, C. J., and ANDERSON, PARSONS, KINTZINGER, and RICHARDS, JJ., concur.